Good morning, Your Honor. If it pleases the Court, my name is Frank Say and I represent the petitioner, Ms. Vasquez-Mariazegos. This is an equitable tolling issue, Your Honor. In our appeal to the Ninth Circuit, we tried to limit the issue really just to this equitable tolling issue. In fact, this appeal would not have occurred if not for the key issue. The factual issue is that for eight years after my client received an in absentia order of removal, she had applied to the USCIS for a work permit as a derivative spouse of someone from Guatemala who applied for asylum. And so from 1998 to 2006... And she, when she applied for this spousal Nicara, which is what it was, is that right? That was within the time period with which she could have filed a motion to reopen, is that right? That's correct. Barely, but... And the statute of limitations for Nicara for a motion to reopen was September 1998. What is your, I mean, see if you can articulate your basic tolling theory. Is it that the BIA should at that point have told her about the deportation order and then she could have filed for it or is it, what is it exactly? That's correct. At any point when USCIS received that application, probably in 2013 the way USCIS is set up now, they probably would immediately, all their computer systems are more linked than they used to be and they would have told her, you don't qualify. In fact, you have a removal order show up. Because at that point she did give them an A number and an address. That's correct. The problem is that earlier, see I read your briefs as relying on the fact that she hadn't received, more like a traditional motion to reopen and she hadn't received the original order, but that's a really difficult argument because she didn't give them, she never gave them a valid address. She never gave them an address at which she was ever going to be. I think that's correct. If you look at our brief to the Ninth Circuit, everything is about equitable tolling. I understand that, but I thought your original equitable tolling argument was that she didn't know that she'd been deported and she didn't know she was supposed to give them an updated address. But the problem with that is she never gave them any valid address, really. I would concede that her biggest problem was when she received the OSC in person, she needed to provide the ICE with a change of address or immigration court with a change of address. Or an address. I mean, the address that she gave them was never her address. I believe that's correct. That's what the record would show you on there. Well, that's a fact. Yes. Counsel, I have a different question. A minute ago, in response to Judge Berzon's question, you mentioned your client gave her own A number and information. That was true on the work permits, but was it also true when her husband asked to have her added to his NACARA application? The letter that he wrote actually doesn't include an A number. Okay. So that's the answer to that question, is no. And then my next question really is quite specific as to NACARA. When she asked to be added to his application, I take it, although the briefing doesn't really tell me this, that that was insufficient and she would have, even though the time hadn't run yet, she was required to file her own? She would have needed to file a motion to reopen with the court. And in her case, it would have been with an immigration judge. Okay. Right. Because she had already been subject to a deportation order in absentia. Right. And then there was an additional one year provided for her to actually submit the application. You mean by NACARA? That's correct. Okay. And so my question really is, isn't your estoppel argument that she was relying on her, on the fact that she could piggyback onto her husband's application? Or do I misunderstand your argument? No, that's correct. Because when you started your argument this morning, it sounded like you were relying on the work permits and the government somehow had a burden to tell her to comply with the NACARA deadline. That's a very different argument. So could you please clarify for me? Sure. Obviously, it would be, when Congress passes a law that provides a motion to reopen deadline, obviously other than reading it in a legal journal for immigration attorneys, the general public would have no idea what this means. And it's unreasonable to say. Immigration attorneys probably don't have any idea what it means. That might be true. But in cases where, because there is a specific deadline for someone to reopen a deportation case, someone who already has a removal, a deportation order, Congress's intent is there must be people out there who already have a deportation order, almost ready to go, but we're going to give them a chance to reopen their case. And in this case, I guess you could say reliance argument is that when her husband notified immigration that, I want to add my wife, here's her name, here's her birthday, in fact, here's a work permit application. Once she's fingerprinted and processed, immigration should have notified her you don't qualify. Okay, so forgive me for interrupting, but you just said something different again. You said when her husband wrote a letter, it did not have her A number on it, as I am understanding from you. That's correct. But now you just said, you said, here's my name, here's my address, here's my work application. Did a work application go with that letter? That's what that letter says. Okay, wait a minute. So did the work application have the A number? Correct. All right. So he did give her the A number at the time that he asked to have her added. Yes. So it's similar, although not exactly the same, as the Socop-Gonzalez case, in which this case. It's up there that he was given. Affirmative advice. Affirmative, erroneous advice. Correct. Right. Now, in this case, but I think there's not a perfect analogy, but it's similar to a high school student who doesn't take finals for ninth grade, that gets promoted every year, and when they go to twelfth grade graduation, they find out that they missed a whole year. Now, we're not asking for a diploma. We're simply asking for a chance to make up those credits. Well, you know, the IJ, at the end of his opinion, said, in any way I would deny this as a matter of discretion. The BIA didn't affirmatively agree with that, but it didn't disagree with it either. So is that an operative's ruling in this case at this point, and does that make all the rest of it sort of spinach? It doesn't matter? I don't think so, because I think that addresses, you know, the original attorney who filed the motion to reopen with the immigration court, you know, they took an alternative approach. They first argued tolling. They argued tolling under the traditional in absentia rules, and they also asked for a su sponte reopening. Right. But the IJ said in that paragraph both that he would not do so sponte, but also even if the motion to reopen were not barred for the above-mentioned reason, he would still deny the motion as a matter of discretion. Then he goes on and says, talks about the su sponte, and then he says the court denies the motion to reopen because she has failed to demonstrate exceptional circumstances. The court finds an exercise, then he says separately, the court finds that an exercise of its authority to reopen this proceeding su sponte would be inappropriate. So that seems to me to be two separate rulings. And it would mean that even, I read it as saying that even if the motion to reopen were granted, even if the motion to reopen was not barred for time purposes, he would still deny it for lack of exceptional circumstances. When I read the Ninth Circuit cases on equitable tolling, I don't see an additional discretionary issue. So in other words, once the court determines that there were circumstances beyond the alien's control, either because of malfeasance by an attorney or by error, something like that, once you're running out of time, wouldn't the best approach for you be to seek to bring this matter to mediation? You thought about that? Look, you've got a woman that came up here from Guatemala. Very risky journey, huh? She gets across the border and she moves into Brownsville. She did work over there. And then she's raped. Is that right? I think that's what that question is. That's what the facts are. And then she ends up in New York, right? Yes. Where was it, Brooklyn? Queens. Queens. All right. And she has a baby there. Actually, I'd call this Nassau County. What? Because I'm from there. What did you say? She's correcting your geography. Correcting your geography. Go ahead. All right. I missed that. What did you say again? She's doing what? No, I was just saying that where she's from is actually not Queens. But go ahead. You wouldn't know that, but I happen to be from there, so I know. All right. Go ahead. All right. Thank you. All right. Then the woman that she's with tells her, well, she's got to really contact the immigration authorities. Then where did she go? Then she finds a ñ if you're asking after ñ I'm asking you where did she go. She had to go contact the immigration authorities. That's what the lady said. That's right. Now, how did she go about doing that? She just showed up. She just showed up to the ICE office. Where? At the border. What border?  She went back to Brownsville. Before she went to New York, she went to Brownsville. She went back to Brownsville. And then they let her in, and she gave me an address in Huntington Park, because that's where the lady she met in Queens told her to give that address. Right? Correct. Okay. And then from there, she went back to New York. Right? Correct. Then she met a guy, a nice man. And they have ñ she has two more children. They're almost adults today. Right. Aren't they? Yes. All right. She's committed no crimes. Is that right? That's right. So she qualifies, I mean, without going through it, for all the Morton factors. Huh? Well, prior counsel did try to come to an agreement with the judge. Well, I'm trying to help you. I understand, Your Honor. We would obviously be amenable to some type of mediation in this case. Well, I'm trying to help you. I mean, you got yourself in a whole complicated estoppel argument and this and that and everything else. Why don't you just take a direct route sometime? Maybe that's the best way to go. I gather your problem is whether the government is really ñ we need to ask the government whether they'd be willing to do it. That's correct. That could be a question addressed to the government. We would definitely be amenable. You ever talk to the government about it? Several years ago. Well, that's a long time. Everything's changed since then. More and more people are getting the benefit of the Morton factors. That's ñ You know that, right? You know that? Yes. Yeah. Okay. All right. Thank you, Your Honor. All right. So you're Mr. Gu? Mr. Go. Go. Okay. So what about having this matter go to mediation? Your Honor, this case was not flagged for prosecutorial discretion by our office. Was that why? It was not flagged for prosecutorial discretion. So what does that mean? Oh, whether ñ to take into account the Morton factors. Somebody didn't think about it? When was the last time anybody at your office looked at this before they gave it to you? Your Honor, the briefs were written in 2010. Yeah, that's three years ago. Yes. Yeah, lots has happened. Yes, I understand. All right. I mean, the short question is would you be ñ what we sometimes do is issue an order that basically says you should have a conversation with our mediators and decide whether you're willing to mediate. So unless you tell us flat no now, you won't do it, which I assume you're not in a position to do. Is there any downside to issuing such an order and suspending this issue of the case? Your Honor, I'm not ñ I will not give a flat no to that question. I can check with the ñ We give you a phone. You can call up and get the answer, right? Your Honor, I believe it will probably take a little bit more time than ñ So in any event, we can go on with the argument. But if we issue such an order, you would go and you'd have a conversation with our mediators and figure out whether to go forward. Yeah. Yes, I believe so. And as Judge Pregerson notes, I mean, if these briefs here were filed in 2010, the Morton memo wasn't written until 2011. Yes. So there's a strong possibility that nobody ever actually looked at it in that light, from what you're saying. They couldn't have, at least at the time of the briefing. Yes, yes, that's correct. Counsel, I have a question about the case. Sure. Can we talk about that? I have a couple questions, really. My first question is this person was subject to a deportation order issued in absentia. Yes. And I think Judge Pregerson's exactly right. She had not given a correct address at any point up until then. But then she did receive, it seems, a series of work permits, and she was using the A number that they gave her back in Brownsville. So she wasn't exactly hiding during those years, and she kept getting the work permits. Was she entitled to them? Your Honor, no, because she had the deportation order that was in effect. So those were all errors. The brief, by the way, is very cagey about it, and we had to go do research to find out that that was true. I don't know why you just didn't say flat out that that's the case, because it is the case. Sure. Right. So I was looking for the same answer, and so now that's not contested. She wasn't entitled to them. So essentially that's a series of mistakes by the government. Is that fair? Your Honor, they are two separate processes. And she wasn't entitled? You are correct. There were a series of mistakes by the government. Your Honor, she erroneously was granted these work permits. And moreover, I mean, what's very interesting about this case. Well, can't you say the government made some mistakes? Your Honor, I did say that by saying that it was erroneously granted. I know, but just say it straight. And what's really interesting about this case and disturbing is that she did at the time I mean, somewhat coincidentally, at the time that she filed the documents for the work authorization, that was within the time period for which she could have filed the motion to reopen it, and anybody told her to. Right. Sure, Your Honor. If anybody had said to her, as you would think they would, oh, look, you're not eligible for this work authorization. You have an order for deportation. Aside from telling her anything, just telling her the facts. Sure. Your Honor, there's two points I'd like to make here. One is, you know. Well, she's illiterate, too. She can't even sign her own name correctly. Makes two mistakes when she signs her name. Well, Your Honor, I think that it goes back to the burden of proof regarding the original deportation order. The OSC that she was issued was read to her in Spanish. But that's the point. We're past that. Let's assume all that. We're past that. It doesn't go back to that. That's the point. It just doesn't go back to that. Sure. What we're focusing on is not that original set of events, but the fact that she walked in to or she communicated with an INS office within the time period to file the motion to reopen, gave them an address, gave them an A number, and instead of being told, oh, look, you've been deported, was told you can stay here and work for the next eight years. Yes, Your Honor. I believe that what you've said goes into whether there is an obligation or a burden on the government to check, you know, the. To take the affirmative step. To take the affirmative step. And I don't know any authority to not issue an erroneous work authorization. You see, if they hadn't issued the erroneous work authorization, if they had done it right, they would have found out that she'd been deported and they would have had to tell her that. But somehow they didn't. They issued an illegal, erroneous work authorization. So they did do something affirmative. Your Honor, I believe there's two separate issues here. One is whether the work permits were issued erroneously or not. Right. And whether the government has an obligation to tell someone that they have an outstanding deportation order. But if they had not issued it erroneously, it would have been because she had an outstanding order and they would have told her that. So it's all of a piece. It's not separate. But what if the government doesn't have the duty to do that, counsel? I'm assuming this woman was deported correctly because she gave them a wrong address. And so there was an immigrant ‑‑ sorry, a deportation order issued in absentia correctly. Yes. By operation of law, she had notice. And so she's subject to a deportation order. But then McCarroll came along. And the government had made, as Judge Berzon said, really a series of mistakes, issuing the same work order several times. I understand this is a separate process. But what I don't understand is why the combination of that reassurance that she received, I think each year for five or six years, coupled with her husband's application saying, please add her to my NACARA application, why wasn't that ‑‑ why isn't that sufficient to form a mistake for purposes of estoppel? In other words ‑‑ forgive me, equitable tolling. In other words, the argument would be her mistake was in relying on these assurances, her misunderstanding. Why isn't that sufficient for equitable estoppel? Your Honor, and I believe this also is addressed in our brief as well, but we believe our position ‑‑ Actually, none of this is addressed in your brief or in the BIA opinion, which the BIA opinion never mentions or the IJ opinion. It's a whole set of circumstance having to do with the work authorization. They don't mention. It's the timeline that's so troubling. So what's your response? Your Honor, what we address in our brief with the equitable estoppel claim is that an equitable ‑‑ to have equitable estoppel requires ‑‑ Equitable tolling. Okay, equitable tolling. Requires the government to engage in affirmative misconduct, and that's what this Court has held in previous cases. We're not talking about estoppel. We're talking about tolling. Yes. Which we would need to find a mistake on her behalf. Sure. Sure. Your Honor, I believe that this is the deficiency in the Petitioner's case. They don't identify any legal authority that talks about that the government's approval of the work permit applications relate to the timely filing of her motion to reopen. And what's the subject here is whether her motion to reopen should be granted with the equitable ‑‑ If the government hadn't ‑‑ the mistake was directly related to the order of deportation, right? The mistake was issuing her the work authorization when she had an order of deportation. Your Honor, I believe the mistake was made with the work permits. Right. With regards to the deportation order, there was no mistake. No, but listen carefully. The mistake with regard to the work authorization was granting it to her when she had an order of deportation, right? That was the mistake. Sure, Your Honor. Okay. Is that right? Your Honor, yes. Okay. So if the person ‑‑ if they had ‑‑ people had been doing their job, the response she would have gotten to her application for work authorization was, you can't have work authorization, you were deported. But that isn't the answer she got, right? In other words, they're connected. There's not a lack of connection here. So she would have known she was deported. So she would have, if she then was diligent, she would have found out that she had four or five months to file a motion to reopen. Your Honor, I do hear you when you're talking about how you believe they're related. The error with the work permits just relates to the error with the work permits, and that's, you know, our position. I mean, if we go down that road and then we talk about other relief that, you know, she could have applied for, that's not directly related to the deportation order. Well, but, you know, here she is, this woman who's had a hard life, who's illiterate in both English and Spanish, and she gets married, and she didn't know there was an order of deportation. She didn't know that. And then she gets these work orders, so she has to believe, my goodness, they give me a work permit, so everything is fine in my life. I can work now, help support my three kids. I mean, what is she supposed to think of? She's allowed to work, so she thinks her status is she's here legally. She's permitted to be here. She's got that golden opportunity to work. We like people to work, is what we say, so she wants to work, so she gets her work permit. And then, you know, you can't rely on, this is other people's briefs, to make sure they bring the right issues, because when we come before, when you come before us, we go through all these files thoroughly as you've learned, right? Yes, sir. Because we're here to see that justice is achieved. So I have a question. This is a slightly different question, then your time is up. With regard to the original order of deportation, she says that she was never told that she had to update her address or that she was going to be in deportation proceedings. Now, the document shows that it was read to her in Spanish, but essentially she's denying that. So does the BIA just disbelieve her because somebody checked a box on the form saying he read it to her in Spanish? I thought the case was essentially you have to credit what she says in her motion to reopen, at least to the point of having a hearing on it. Your Honor, I believe what's at issue here is whether she was given proper service, and she was read that order to show cause she signed it. She essentially says she wasn't. When she says I wasn't told I was in deportation proceedings and I wasn't told I had to update my address, she's saying she wasn't read that order of deportation, isn't she? Your Honor, I mean, she is entitled to say what she wishes to say, but the fact of the matter is ‑‑ The fact of the matter is somebody checked a box. That doesn't mean it's true. She also said that she understood coming away from whatever happened in Texas that a judge was going to be deciding her case, and then her declaration says I didn't understand I was in deportation proceedings. And so my question was is there anything else in the timeline that tells us she would have received notice anywhere else other than what happened right there in Brownsville that a judge was going to decide her case? Your Honor, there's no possible way for the immigration court to give her notice because she gave an address which she was not at. So it seemed to me that I had the same question Judge Berzon had about her denying, and I can understand somebody checking a box incorrectly. That could happen, I suppose. But something was read to her. She came away with an understanding that a judge was going to decide her immigration case, right? Yes. I mean, the order she showed across was read to her. She signed it saying that she understood it, and she understood that she was being served with this order to show up for deportation proceedings. Well, yes, and the basis for you getting back to Judge Berzon's question, the basis for the government's position that this was read to her is the box that was checked, right? Yes, Your Honor. Okay. Fair enough. Thank you. Your Honor, I would like to address one point that was made during the previous conversations with opposing counsel. Your Honor, regarding a matter of discretion, in the board decision, the board actually does state that the board finds no error in the immigration judge's decision to deny the Respondent's motion to reopen. That takes into account the entire decision. I can't tell whether that paragraph is only about the sua sponte issue or if there Is there discretion to deny a motion to reopen as a matter of discretion if you otherwise meet the standards for it? Is that true? Yes, Your Honor. In the immigration judge's decision, you know, they first talk about the eligibility and statutory time deadlines. But there is also, assuming arguendo, that those time deadlines do not apply. The motion to reopen is within the immigration court's discretion. On what basis? Your Honor, that is the standard in which the motion to reopen is evaluated. The motion to reopen goes based on changed circumstances or new facts that were not available before. And it's up to the immigration court to This is something I didn't understand. Under NACARA, when you have the authority to file a motion to reopen, a one-shot motion to reopen by a certain date, do you have to meet the otherwise applicable substantive standards for a motion to reopen? Or is it sufficient that you're eligible for NACARA? In other words, was it possible under NACARA to file a motion to reopen saying, my deportation order should be reopened because under NACARA I would be eligible for a leave? Is that a ground? Your Honor, I do believe that it Or do you have to meet the standards that would apply, say, to an in absentia order? I don't think so. I think it's a different kind of motion to reopen. Your Honor, I guess it does go with the timeliness of it. Asking for tolling to allow a motion to reopen. One reason is though I'm asking substantively. Substantively, what is the ground? If he's denying the motion to reopen, I'll turn to the merits. If you read it that way, what are the merits at that point? Your Honor, to answer your question, being able to file being eligible for NACARA and filing before the September 11, 1998 deadline would be sufficient to If it were timely The INS has agreed all along, as I understand it, that she was prima facie eligible for NACARA. So what would be the ground for denying her a motion to reopen? Your Honor, it would be with regards to showing the extraordinary circumstances with regards to allowing a motion to reopen to occur. I don't understand this. This is important. If she had filed before September of 1998 would she have had to show a reason to reopen or would they have gone straight to the NACARA merits determination? Your Honor, I I would be happy to brief this matter because I want to make sure that I'm giving you the correct information on this. All right. Because when she was denied when they wrote back to her lawyer they said she's prima facie eligible but because of the timeliness, she can't have it. They didn't say that there was any other decision to be made. Yes. Your Honor, I would want to brief on this matter but I can't offer my opinion. I want to make sure that I'm accurate. Okay. Thanks for being careful. All right. So what are we going to do about the variation? Your Honor, I can check with the agency to see if this case falls within the Morton guidelines. Well, it clearly does. The answer to that is it does. Okay. I mean, it's perfect. This woman's been here for, what, 25 years and there's no record of her ever doing anything wrong and she has three American citizen kids and so on. Okay. Your Honor, I understand the Court's position. I will check with my agency and see if, you know, we should proceed in that manner. All right. Thank you. Thank you, Your Honor. Your Honor, since we both went over the time, I think, especially since this issue of prosecutorial discretion is going to be addressed, I have no rebuttal. Your Honor. All right. Thank you. The matter is submitted. We'll call the next item on the calendar, Katchatarian v. Holder.
judges: Pregerson, Berzon, Christen